*Decision will be entered under Rule 50.*

SECURITY-FIRST NATIONAL BANK OF LOS ANGELES, EXECUTOR OF THE ESTATE OF MILTON SILLS, DECEDENT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64737. Promulgated April 2, 1937.

*Joseph D. Brady, Esq.*, for the petitioner.
*E. G. Smith, Esq.*, for the respondent.

OPINION.

ARNOLD: This is a proceeding for the redetermination of a deficiency in estate tax in the amount of $6,796.43. The issues are (1) whether respondent erred in determining the value at which the decedent's remainder interest in a certain trust should be included in his gross estate, and (2) whether respondent erred in determining that the amount of a refund of income tax of the decedent for the year 1928, together with the interest thereon, should be included in the gross estate.

Petitioner's decedent, Milton Sills, died testate at Los Angeles, California, on September 16, 1930.

Gwladys Edith Sills was born on November 5, 1886, and on September 15, 1925, was the wife of decedent. Dorothy Gardyne Sills, daughter of decedent and Gwladys Edith Sills, was born on April 19, 1911.

On September 15, 1925, decedent entered into a written agreement with the Guaranty Trust Co. of New York, whereby decedent transferred to the trust company, as trustee, and to its successors in trust, certain property and securities. Said trustee accepted the trust, and on September 16, 1930, held the trust property subject to the terms and conditions of the agreement of September 15, 1925.

The trust agreement provided that the trustee was to receive, hold, manage, sell, invest, and keep invested the trust property and securities, and to collect the income therefrom, and, after deducting the necessary expenses of administration, to pay over the net income, to the extent of $5,000 during the first year, $10,000 during the second year, and $15,000 during each of the remaining years of the trust, in equal monthly installments, to Gwladys Edith Sills, during her lifetime, and to pay over all the net income in excess thereof, at the end of each year of the life of the trust, to decedent or his estate.

The trust instrument further provided that at the death of Gwladys Edith Sills, if the daughter, Dorothy Gardyne Sills, be then deceased, all the principal of the trust should revert to, and be conveyed, transferred, and paid over by the trustee to the decedent

or his estate, and that if the said daughter should survive her mother, property and securities having an actual market value of $100,000 should be retained by the trustee under the terms and conditions of the trust instrument and the net income therefrom paid over to the daughter during her lifetime; and, further, that the balance of the principal should, in the event of the daughter's surviving her mother, revert to and be transferred by the trustee to decedent or his estate at the death of his wife, and that part of the principal so retained in trust for the daughter should revert to and be transferred to decedent or his estate at the death of the daughter.

Decedent agreed in the trust instrument that if at any time after October 1, 1927, by reason of the depreciation or default of any of the property or securities held in the trust, the total market value of the principal should be less than $300,000, he would, if his wife should then be living, deliver additional property and securities equal in market value to such deficiency to the trustee to be held under the terms and conditions of the trust agreement. Decedent further agreed that he would at all times have provision made by his last will and testament to the effect that if his wife survived him and if at the date of his death the total market value of all the property and securities held in the trust was less than $300,000, property and securities equal to the amount by which the said total market value should be less than $300,000, belonging to his estate, should be by his executor taken from his estate and delivered to the trust to be held under the terms and conditions of the trust instrument and to become a part of the principal of the trust.

As determined by respondent, and as alleged in the petition, the properties and securities in said trust had a total market value on September 15, 1930, of $309,733.92. The par value was $316,000, as disclosed by the list of securities in evidence.

Respondent determined that the fair market value, at the time of death, of decedent's interest in the annual net income of the trust in excess of $15,000 was $30,000, and included that value in the gross estate.

Respondent determined the value of decedent's interest in the excess net income by assuming that the average earnings of the trust during the lifetime of Gwladys Edith Sills in excess of $15,000 would be $1,500 per annum and that such excess should be capitalized at 5 percent.

Respondent determined that the value at the time of death of the interest of decedent in the principal of the trust, subject to the life tenancies of Gwladys Edith and Dorothy Gardyne Sills, was $82,325.47.

Petitioner, in the return filed for the estate of decedent, included in the gross estate all of the several interests of decedent in the trust at the time of his death at the total value of $21,500, which respondent, in determining the deficiency, increased to $112,325.47.

On or about November 20, 1930, petitioner, as executor of the decedent's estate, filed with the collector of internal revenue at Los Angeles, California, a claim for refund of a part of the Federal income tax paid by decedent for the year 1928. On or about March 3, 1931, respondent determined that the corrected income tax liability of the decedent for the year 1928 was $16,541.28 and that decedent had made an overpayment for that year in the amount of $22,212.14. Subsequently, during the month of October 1931, respondent refunded the overpayment of $22,212.14, together with interest thereon in the amount of $1,617.73. In determining the deficiency respondent included said overpayment of tax, together with the interest thereon, as a part of the decedent's gross estate in the full amount of $23,829.87.

Of the amount so refunded, $17,599.32 represented tax paid by the decedent on his wife's share of his community earnings as determined by the respondent. This amount was credited against the corresponding deficiency found by the respondent against decedent's wife in making the adjustment. The remainder of the refund, including interest thereon, was paid to petitioner in the amount of $6,471.79, as executor of the estate.

Under the first issue petitioner contends that the fair value at the date of death of all of the decedent's interests in both the income and corpus of the trust was not in excess of $21,500, and that respondent erred in determining the value to be $112,325.47.

That decedent's interest in the excess income and his reversionary interest in the corpus, subject to the rights of the beneficiaries to receive the specified income for life, constituted valuable property rights is admitted by both parties. That the fair value of such property rights at the date of death should be included in the decedent's gross estate is also conceded by the parties. And it is further agreed that the proper method of determining the amount of such value is to reduce the value of the property rights to their present worth at the date of decedent's death on the basis of the life expectancies of the life tenants as ascertained by the generally recognized mortality tables. The use of such method is provided for in respondent's Regulations 70, article 13, and has been approved by both the Board and the courts in many cases. See *Simpson* v. *United States*, 252 U. S. 547; *Ithaca Trust Co.* v. *United States*, 279 U. S. 151; *William Huggett*, 24 B. T. A. 669, 675; *James Klein Bowen*, 27 B. T. A. 824, 828; *Fidelity-Philadelphia Trust Co. et al., Executors*, 27 B. T. A. 972, 979.

The sole controversy here on this point relates to the interest or discount factor. Respondent used the rate of 5 percent, while petitioner argues that in order to determine the fair market value of the decedent's property rights a discount rate of 10 percent should be used. In support of its contention petitioner offered the testimony of two valuation experts, who expressed the opinions that the fair market value of the decedent's interest in the trust at the date of his death was $20,000 to $21,500. These estimates were based upon a discount rate of 10 percent.

When witness Creer was asked on direct examination how he arrived at the value placed on the interest, the Member who heard the case expressed the opinion that that was a matter for cross-examination. Attorney for petitioner thereupon withdrew the question.

When witness Meloth stated as his opinion that the fair market value as of September 16, 1930, of the interest was approximately $20,000, attorney for petitioner stated, "I would like Your Honor to know his reasons for that determination but if you think otherwise, I won't question him further." The Member replied that when an expert qualifies and then gives his opinion he did not see the necessity of bolstering him up any further; to which petitioner's attorney replied, "All right, I will just ask one or two questions with respect to the value of any of the claim for refund."

We do not think petitioner has any cause for complaint on account of these statements of the presiding Member at the hearing, especially in view of the fact that witness Meloth did give the basis of his determination in fixing value.

An examination of the testimony of petitioner's expert witnesses in the light of other facts in the record convinces us that their opinion as to the value of the decedent's interest in the trust on September 16, 1930, can be given very little weight. It appears evident from their testimony that the value placed by them is not the fair market value of the interest, but a highly speculative value. Witness Creer testified that, in 20 years' experience in the trust department of a bank which had the administration of about $400,000,000 of trust funds, he had only known of three or four instances of transfers of such interests. In one of these, the only specific instance he gave, he testified that "the transfer of the interest was upon a basis which, under any contingency, would have been highly profitable to the purchaser." Petitioner's return was prepared under the supervision of this witness and, upon being asked on direct examination how he arrived at the value of $21,500 reported in the return, he said:

A. An asset of that kind is, of course, hard to value. The market for it is restricted. No one will buy an interest of that kind where it is based on contingencies of lives, except on a basis that is going to work out a good profit. no matter what contingency happens. * * *

It seems evident from this testimony that the witness had in mind a price that would yield the purchaser a good profit, "no matter what contingency happens." This, we think, has no relation to the fair market value.

Witness Meloth characterized the interest of the decedent in the trust as not being "bankable", or having any collateral value; as not being liquid. He testified that it would find a very small, if any, market value; and, further, that he thought a purchaser would rather buy something he would have in his possession to do with as he pleased than to purchase something in which he had only a very theoretical interest, running over a long period of time.

Measured by this yardstick the interest of the decedent was no different from any other estate in remainder. Such estates are not generally considered "bankable" in the ordinary acceptation of that term or as having collateral value. Certainly they are not "liquid", since they can come into possession only at the termination of the intervening estate, but, notwithstanding these facts, the Board and the courts have repeatedly sustained the Commissioner's method of computing their value by the use of the mortality tables at a rate of 4 percent.

In *Simpson* v. *United States*, *supra*, the taxpayer objected to the assumption by the trial court of a rate of 4 percent as the value of money in computing the tax, and in disposing of this contention, the Supreme Court said:

* * * we take judicial notice of the fact that at the time this tax was collected, 4 per cent was very generally assumed to be the fair value or earning power of money safely invested. Both the method and rate adopted in this case have been assumed by this court, without discussion, as proper in computing the amount of tax that has been collected * * *.

Meloth further testified that as of September 16, 1930, the fair return of money safely invested in the highest grade bonds was 4½ percent, which would increase to between 5 and 6 percent in the more speculative grades, and that the securities in the trust ranged from a high grade to a medium grade or speculative character.

An examination of the list of securities in the trust, which is in evidence, shows their average market value on September 15, 1930, to be approximately 97⅔, and more than 50 percent of them were above par. This was approximately a year after the crash of the stock market in 1929, and, we think, justifies the conclusion that the securities were generally of a high and medium grade, with, perhaps, a relatively small portion of a more speculative character. The securities all consisted of bonds except 100 shares of $6 preferred stock which had a market value of $92 per share. To say that securities of this type having par value of $316,000 and a

market value of $309,733.92 should be treated as so highly speculative as to require a factor of 10 percent in determining their present worth under the mortality tables would ignore the facts in the record and take us far afield in determining the value of the remainder interest under the revenue law and the regulations of the Commissioner.

It is common knowledge that residuary interests, such as we have here, are family interests, not regularly dealt in by investors, and seldom sold. It is evident that such interests have no readily ascertainable market value that can be established by sales. Therefore the regulations of the Commissioner, which have the force and effect of law, cf. *Maryland Casualty Co.* v. *United States*, 251 U. S. 342; *Crocker* v. *Lucas*, 37 Fed. (2d) 275, require that the value of such interests be determined by the use of the mortality tables, taking as a basis the fair market value of the property included in the intervening estate. This fair market value is treated as cash in computing the value of the interest which is included in the gross estate for tax purposes. If the trust property here consisted of cash or Government bonds, it could not be seriously argued that the use of a factor of 10 percent would be justified by the law and the regulations or by the decisions of the Board and the courts, in determining the value of the residuary interest of the decedent's estate. But cash must be invested in securities or other income-producing property in order to carry out the purposes of the trust, and where, as here, the trustees have the power to sell and reinvest, the situations are not materially different. Furthermore under the laws of the State of New York, which is the situs of this trust, there are very strict regulations as to the character of securities in which the trustees may invest. Personal Property Law of New York, sec. 21.

We are not bound to accept the opinions as to valuation of expert witnesses as conclusive, particularly where such opinions are predicated upon factors which we conclude are unsound. Their opinions are to be judged in accordance with the soundness of their reasoning which is disclosed. The Board is at liberty to reject such opinions and form its own opinion on the facts presented. *Fidelity Title & Trust Co.* v. *Commissioner*, 64 Fed. (2d) 52. Cf. *Saxman Coal & Coke Co.* v. *Commissioner*, 43 Fed. (2d) 556; *Wessel* v. *United States*, 49 Fed. (2d) 137; *H. H. Blumenthal*, 21 B. T. A. 901; *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893; *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio*, 292 U. S. 290. The Board is not bound by expert testimony solely because there was no witness to contradict it, *Old Mission Portland Cement Co.* v. *Commissioner*, 69 Fed. (2d) 676.

Indeed, as we read their testimony as a whole, the truth becomes obvious that the real value of the remainder interest was playing a subordinate role with them and their ultimate appraisal was a forecast, speculative in the extreme. Certainly it had no "such commanding quality as to apply coercion to the judgment of the appointed triers of the facts, and exclude every choice but one." Cf. *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio, supra.* It is apparent from a consideration of their entire testimony that the value fixed by petitioner's expert witnesses does not bear any relation to the real value of the residuary estate, but is based upon the assumption that a purchaser would not be interested in buying a remainder interest unless at a price so low that it eliminated all ordinary risks incident to such an investment. It amounts to nothing more than a bid price and has no necessary relation to a fair market value. Moreover, the value as thus fixed does not give any effect, so far as the record shows, to the excess income of the trust which was distributable to the estate.

The computation of the value of the residuary estate under article 13 of Regulations 70 is in accordance with the accepted practice of the Treasury Department, which has time and again been approved by this Board and the courts. Article 13 provides for the use of an interest rate of 4 percent, compounded annually, but because of the fact that the decedent had an interest in the income of the trust over the specified amount to be paid to the beneficiaries, which had averaged up to the time of his death approximately $1,500 a year, and the further fact that the average annual earnings of the trust had been about $5\frac{1}{3}$ percent, respondent deemed it proper, in computing the deficiency, to use a rate of 5 percent rather than 4 percent.

The record shows that $170,000, par value of the securities, carried an interest rate of from 6 to 7 percent; that $71,000 par value carried an interest rate of $5\frac{1}{2}$ percent and $76,000 par value carried an interest rate of 5 percent. While the excess income may have averaged $1,500 in prior years and undoubtedly had some value which should be considered, there is no assurance that it will continue and it must be regarded as very speculative. Considering the whole record, including the speculative character of some of. the securities and the length of time involved in the life expectancy, and the interest rate which they carry, we think a factor of 6 percent is fair and reasonable.

In determining the deficiency the Commissioner considered the average excess income as $1,500 and computed its value at $30,000, which was deducted from the value of the trust property before computing its present worth. Since the $1,500 does not represent a fixed annuity, but may fluctuate or cease altogether, we think this treatment is in error. The value of the remainder interest should be computed by determining the present worth of the entire trust

estate, giving effect to the life tenancy of Mrs. Sills and Dorothy Sills, respectively. Since the portion of the principal that will affect Dorothy Sills is $100,000, the computation should be on $209,733.92 for the life of Mrs. Sills and $100,000 for the life of Dorothy Sills. In the factor of 6 percent we have considered whatever value may be attached to the excess income.

At the hearing counsel for petitioner stated that respondent had made a slight error in the selection of one of the factors used in computing the value of the reversionary interest in that part of the trust corpus subject to the life estate of the daughter, and further indicated that respondent conceded such error. However, counsel for respondent did not reply, and no proof was offered on the point. The error, if any, may be corrected on final settlement under Rule 50.

The second issue calls in question the correctness of the respondent's action in including in the gross estate the face value of a claim for refund of decedent's income tax for 1928, allowed and paid in October 1931, together with the interest thereon. Inasmuch as the claim for refund arose on account of the decedent having included all of his community earnings in his return instead of only half of them, petitioner contends that since the right to recover the amount of the claim was dependent upon the outcome of litigation then pending in the courts involving the right of married persons in California each to make a separate return of one-half of the community income, which question was settled by the Supreme Court's decision in *United States* v. *Malcolm*, 282 U. S. 792, rendered January 19, 1931, the claim for refund in controversy had no fair market value at the time of decedent's death and hence should not be included in any amount in the gross estate.

We are of the opinion that the contention urged by the petitioner is not sound. The full amount of the claim was actually due and owing to the decedent at the time he died, and was in fact paid with interest in the following year. The claim was in reality worth its face value, and we think under the circumstances present here so much of it as represented an overpayment on the separate property of the decedent should be included at such value in the gross estate.

The burden of petitioner's argument is that the claim had no fair market value at the time of decedent's death for the reason that no prudent person would have purchased such a claim in the face of the uncertainties existing prior to the above mentioned decision of the Supreme Court in 1931. While it is undoubtedly true that fair market value is the basis upon which property may properly be included in determining the value of the gross estate of a decedent, we think it does not follow that, under the statute, property clearly having a definite intrinsic or actual value may be excluded merely because at the moment of death there may have been no

generally recognized market for it. What constitutes fair market value is generally a matter of opinion, and is often if not always difficult to determine with accuracy. As was said by the court in *Crawford* v. *Helvering*, 70 Fed. (2d) 744:

It is generally conceded by most of the courts which have had to deal with the subject that there is no definite formula by which to determine fair market value as that term is used in the tax statutes. The question, as all agree, is necessarily one of fact to be determined by the evidence, * * *. Actual sales may be shown, as may also intrinsic value; book value may be considered, as also earning capacity. These are all elements which tend to the ascertainment of fair market value, and when considered together or singly, may establish the fact.

It has been held that corporate stock had a fair market value for tax purposes even though it was not listed on the stock exchange, and there was no dealers' market for it, and there was no evidence of any sales. In such case, the intrinsic or actual value or book value may be taken as the equivalent of fair market value. *French Dry Cleaning Co.* v. *Commissioner*, 72 Fed. (2d) 167.

The full amount of the claim with interest was paid in 1931, but a portion of the refund appears to have been applied against the deficiency in the income tax of the decedent's wife for 1928, which deficiency arose on account of adjustments in connection with the returns of herself and the decedent during the taxable year. Petitioner claims in the alternative that only one-half of the amount actually refunded to the estate in cash should be included in the gross estate for purposes of the estate tax.

The action of respondent in including the $17,599.32 in the value of the estate and at the same time using it to pay the deficiency in tax of decedent's wife is not consistent. The theory on which it might be used to pay the wife's deficiency is based on the assumption that the community income returned by the husband belonged one-half to the wife and that to the extent of the income tax on the wife's one-half it was her money used to pay the tax. Cf. *Clayton* v. *United States*, 44 Fed. (2d) 427. If this be true then it could not be included in the estate of her husband because under the community property laws of California it never became a part of his estate. Upon the death of the decedent the community was dissolved and one-half of all existing community property belonged to the surviving spouse. The wife's half undoubtedly included all of the refund applicable to her half of the community property and, even were it refundable to the decedent's estate under the law governing refunds, it would not be an asset of the estate but a liability existing in favor of the wife and would have been payable to her or the executor as a part of her share of the community property under the law of California.

As to that portion of the refund (in excess of the $17,599.32) which was paid to petitioner as executor of the estate, the amount properly attributable to tax paid on community property retains its status as community property, *Clayton* v. *United States, supra*, and only one-half of such amount may be included in the gross estate. The amount of such refund, if any, in excess of such tax on community property must also be included in the gross estate, since there is no evidence that it is community property.

What we have said above applies to the principal amount of the claim and the interest accrued to the date of decedent's death. That part of the interest which accrued subsequent to decedent's death represents compensation for the use of the money thereafter and up to the time of payment. It constitutes income to the estate and does not enter into the value of the estate at the time the decedent died. The amount to be included in the gross estate will be modified accordingly.

The memorandum opinion heretofore entered in this case, having been reconsidered, is hereby revoked.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

MURDOCK, dissenting: I think the petitioner is entitled either to a new trial or else to judgment on the valuation issue. Anything short of one of these two solutions is both unfair and unjust to the petitioner. The effect of the prevailing opinion is to fix a value less than that determined by the Commissioner but far greater than that testified to by the witnesses. I know that my colleagues who support the prevailing opinion have no desire to be either unfair or unjust. Apparently they do not fully realize how inconsistent their action is with what took place at the hearing.

A former Member of the Board, now deceased, heard the evidence in the case. The question was to determine, as of the date of death, the value of the decedent's rights to receive payments in the future under the trust instrument. The petitioner recognized that it had the burden of proof. It called two witnesses to sustain that burden. It qualified each witness to the satisfaction of the Board Member presiding at the hearing. The witnesses expressed their opinions that at the date of his death the value of the decedent's rights under the trust was between $20,000 and $21,500. Counsel for the petitioner attempted to have each of these witnesses state in full the method by which he had arrived at his valuation figure. But in the case of each witness the Member presiding refused to allow this explanation to come in under direct examination. The brief cross-examination brought out nothing further and the result was that neither of the

witnesses was permitted to give a full explanation of how he had arrived at his opinion of value. The respondent offered no evidence.

No specific finding of fact as to value is made, but the author of the prevailing opinion, who neither heard nor saw the witnesses, casts their opinions aside and directs that a factor of 6 percent be used in determining the value of the interests in question as of the date of the decedent's death. This will result in the fixing of a value less than that determined by the Commissioner but almost four times as great as that testified to by the witnesses. I am not concerned for the moment with the question of whether or not there is evidence in the record supporting the use of a 6 percent yield or discount factor. The point I make is that, since the Member who presided at the hearing was satisfied with the qualifications of the witnesses to express opinions and refused to allow their methods to be disclosed under direct examination, it is unfair and unjust to the petitioner for another Member of the Board to cast aside and disregard the opinions of those witnesses on the ground that they did not give convincing reasons supporting their opinions. Yet that is what is being done. The opinions of the witnesses are cast aside and that action is justified as follows:

We are not bound to accept the opinions as to valuation of expert witnesses as conclusive, particularly where such opinions are predicated upon factors which we conclude are unsound. Their opinions are to be judged in accordance with the soundness of their reasoning which is disclosed. The Board is at liberty to reject such opinions and form its own opinion on the facts presented.

Thus the petitioner has been trapped by the Board.

It is another question whether the Board should order a new trial to give counsel for the petitioner a chance to have his witnesses explain their methods of valuation or whether their opinions as expressed should control. The rules of evidence governing in proceeding before the Board are the rules of evidence applicable in the courts of equity in the District of Columbia. I believe those rules required the Member who presided at the hearing to allow counsel for the petitioner to have his witnesses fully explain their methods of valuation. But, if the Board is not now satisfied to accept the opinions of the only witnesses called, clearly the petitioner is entitled to a new trial and should not receive an adverse decision on the present record. If, however, the Member presiding at the hearing was correct in his ruling, then the Board should find as a fact that the value was $21,500. The opinions of the witnesses were certainly not weakened by the meager cross-examination. It is true that the record contains a partial disclosure of the factors, method and reasoning used by one of the witnesses. But that evidence does not afford a fair basis upon which to hold that the

opinions of these witnesses are not entitled to weight. They were denied the right to explain in full. They never made a full explanation and their opinions should not be judged and found wanting upon the fragments of their explanations contained in this record.

The Board, rejecting both the determination of the Commissioner and the value testified to by the witnesses, directs that a value be determined by the use of a 6 percent discount factor. Ordinarily the Board is not bound by opinions of witnesses. But it should have good reasons if it is to disregard their testimony. Here I think the Board has misunderstood the effect of various factors and has expressed inadequate and unsound reasons for its action. This is, of course, aside from the more serious mistake discussed above.

The petitioner agrees that some amount may properly be included in the gross estate representing the value at the date of death of the decedent's rights to receive future payments of income and corpus under the trust instrument. The parties are in agreement that the uncertainties in regard to the element of time involved in the valuations may be resolved by the use of mortality tables. The decedent's rights under the trust instrument involved certain risks dependent upon future earning power of the trust property, the safety of the trust investments, and perhaps other factors. Those uncertainties can not be resolved by the use of mortality tables, and the parties are in disagreement as to the proper factor to be used in making allowance for the risks involved. The Commissioner has set forth in his regulations a table for use in determining the present value of future payments. No doubt that table is useful in many ways to the Commissioner, particularly for the guidance of subordinates in the Bureau of Internal Revenue, but the promulgation of such a table in the Commissioner's regulations was never intended to have and does not have "the force and effect of law." *Safe Deposit & Trust Co. of Baltimore, Executor*, 35 B. T. A. 259. Neither does it establish a rule of evidence. There is no evidence and no authorities are cited to show whether, or to what extent, such a table, or some modification of it, might be properly used in a case like the present one. The Commissioner did not use the table in determining the deficiency and does not urge its use now. The table is based upon a 4 percent discount factor. The Commissioner computed the value in question on the basis of a 5 percent discount or yield figure instead of the 4 percent used in the table. Since the securities in the trust were yielding in excess of 5 percent it may be fair to conclude that the Commissioner erred in valuing the reversionary interest on only a 5 percent yield basis. But what justification is there in the record for the selection by the Board of a 6 percent discount factor?

The record contains a description of the securities in the trust at the date of the decedent's death, with certain other information in regard to the value and earnings of those securities. But this evidence neither weakened the opinions of the witnesses nor established a basis for the determination by the Board of a different value from that given by the witnesses. They gave their opinions in the light of that evidence. The function of the Board is to hear the evidence and determine the facts from that evidence. The Board has no expert knowledge of its own relating to values. If it had any special knowledge bearing upon this case it could not properly use that knowledge in the decision of the case. The facts must come from the record, not from the mind of the Board. Value is a question of fact. The facts which demonstrate value or lack of it must be proven. The Members of the Board have no way of determining from the present record that 6 percent is a proper factor of discount or yield to be used in the valuation of this particular property. The prevailing opinion is open to further criticism because therein fault is found with the opinions of the witnesses without good reason, the current earning power of money safely invested is confused with the percentage of yield which a purchaser of the rights in question might expect and demand, and at one place the present worth of the securities in the trust is discussed as if that were the question in issue. Those securities had been placed in a trust. The decedent had neither possession nor control. A possible purchaser of the decedent's interest would have no more than he had. Such an investment might well be unattractive from the standpoint of possession, control, liquidity, and current earnings. These and other characteristics of the rights might be expected to have an important bearing upon the value of this interest at the time of the decedent's death. Counsel for the petitioner apparently obtained the best qualified witnesses that were available. Yet these men knew of only a few instances where there had been transfers of interests such as those involved herein. The Board Members probably have no independent knowledge of any such transfers, and, if they have, they have no right to use it in deciding this case. Yet the opinions of the witnesses are cast aside and there are substituted the opinions of persons less well informed on the subject of the value of the particular interests in question.

---

MELLOTT, dissenting: The parties seem to agree that the fair value of the interest of the estate in the excess income and in the corpus of the trust can best be determined by reducing them to their present

value by the use of the actuarial or combined experience tables of mortality. The prevailing opinion, however, rejects this method entirely, in so far as the right to receive the excess income is concerned, and substitutes therefor a mere statement that "whatever value" it has, has been considered in fixing the factor of 6 percent to be used in valuing the right to receive the corpus of the trust. If the method used has resulted in a reasonably close approximation to the correct value of the interest in the excess income, that is a mere fortuitous circumstance; for it falls far short of being scientific or exact enough to achieve the same result in similar cases which will arise. The use of actuarial or mortality tables, on the other hand, at least enables taxpayers and the Government to approach the complex and difficult problem of valuing such estates in the most scientific manner that has been devised; and until a better formula than that set out in the prevailing opinion is worked out, I think we should continue to use such tables.

I agree with the views of Member Murdock, expressed in the dissenting opinion, to the effect that the witnesses should have been allowed to explain their methods of valuation, and, since they were not permitted to do so, I also feel that a new trial should be granted. I am of the opinion, however, that the preesnt record does not justify us in overturning the determination which the respondent made upon the valuation issue.