Estate of Ruth M. Smith, Roy R. Charles, Co-executor v. Commissioner.
Estate of Smith v. Commissioner
Docket No. 2156-67.
United States Tax Court
T.C. Memo 1969-28; 1969 Tax Ct. Memo LEXIS 266; 28 T.C.M. (CCH) 127; T.C.M. (RIA) 69028; February 12, 1969, Filed P.A. Agelasto, 896 City Bank Bldg., Norfolk, Va., for the petitioner. Marion B. Morton and Robert E. Lee, for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent has determined a gross deficiency in federal estate tax in the amount of $714,494.11 and a net deficiency of $588,890.18 upon allowing "additional credit for state death taxes allowable if substantiated" in the amount of $125,603.93. After the concession of a minor issue by respondent and the agreement of both parties that the issue concerning the amount of additional expense of administration will be settled in later computation to be filed herein, the question remaining for our decision in this case is as follows: What was the fair market value on November 4, 1962, the date of decedent's death, of a reversionary *267 interest in an inter vivos trust established by decedent on July 1, 1959, which was to terminate on July 31, 1969 all of the income of which, including certain capital gains if and when realized, was to be distributed by the trustees for charitable purposes. Findings of Fact Some of the facts have been stipulated. The stipulated facts and exhibits attached thereto are incorporated by this reference. Petitioner is the Estate of Ruth M. Smith acting through Roy R. Charles, surviving co-executor, who resides at Norfolk, Virginia, and who resided in Norfolk at the time the original and amended petitions were filed with the Court. Ruth M. Smith died on November 4, 1962. Marjorie S. Charles, her daughter, and Roy R. Charles, the husband of Marjorie, were appointed as joint executrix and executor of Ruth's estate. Marjorie died on August 21, 1964, and left Roy as the surviving executor of Ruth's estate. Original and amended estate tax returns were filed on behalf of Ruth's estate with the district director of internal revenue at Richmond, Virginia. Ruth was the wife of Oscar F. Smith, a wealthy businessman residing in Norfolk who was prominent in the civic and charitable activities *268 of that city. Oscar died on May 4, 1950, leaving as his heirs Ruth, his wife, and Marjorie, his daughter. By his will, Oscar left the remainder of his estate after the satisfaction of certain bequests and expenses of administration to designated trustees who were empowered within their uncontrolled discretion to pay at any time any amounts of income or corpus to Ruth or Marjorie. By a decree of the Circuit Court of the city of Norfolk entered on April 15, 1959, the trustees of Oscar's testamentary trust were authorized to implement a decision they had made to terminate the trust and divide its corpus equally between Ruth and Marjorie. Equal distributions were then made to Ruth and Marjorie prior to July 1, 1959. Shortly after receiving their respective distributions from the trustees of Oscar's estate, Ruth and Marjorie on July 1, 1959, by separate, similar, and irrevocable trust indentures, transferred their interests in certain stocks they had received from Oscar's estate to named trustees in trust to apply the net income after administrative expenses to stated charitable purposes. By their trust indentures, Ruth and Marjorie established The Oscar F. Smith Memorial Foundation (hereinafter *269 sometimes referred to as the "Foundation" or "Trust"). The Foundation was made up of the Ruth M. Smith Section (the trust created by Ruth) and the Marjorie S. Charles Section (the trust created by Marjorie). The trusts created by Ruth and Marjorie were to last for ten years and one month, until July 31, 1969, and at that time the property of each trust was to revert to the grantors. The trustees designated in Ruth's trust indenture of July 1, 1959, were R. W. 128 Dudley Joseph C. Jett S. T. Northern, Abner S. Pope, R.B. Rowland, Jr., Bess S. Moore, and J. A. Woods. These trustees were close friends or business acquaintants or both of Oscar, and had a high regard for him and for his family. Three of them had been named as testamentary trustees by Oscar in his will and one as substitute trustee. Consistent with their duties as trustees they would do nothing prejudicial to the interests of Ruth or Marjorie. Pertinent provisions of Ruth's July 1, 1959 trust indenture are as follows: SIX: On July 31, 1969, all accumulations then held by the Trustees shall be used solely for the purposes of this trust, save and except those items which represent corpus or which have been assigned *270 to corpus in lieu of dispositions or realizations from corpus. It is the intent and purpose of this trust indenture that the party of the first part [Ruth] will have returned to her or to her beneficiaries and assigns, on July 31, 1969, all, but only, those items which are herein transferred to the Trustees, together with stock dividends or divisions which do not change her percentage of ownership in the corporation issuing such stock, together with all those items which may be acquired with funds arising from the sale or other disposition of any part of the original terms of corpus herein assigned, capital gains excluded, or acquired with funds originally arising from such corpus. All realized capital gains as defined for federal income tax purposes shall be considered distributable income for the purposes of this trust. SEVEN: The Trustees by their majority vote shall have full authority in their discretion to sell any part of the corpus herein assigned and to invest and reinvest the proceeds in other investments, and such other investments or reinvestments shall become a part of the corpus hereof; provided, however, that during the term no sale beyond twenty (20%) percent in *271 quantity of investments in the securities of Smith-Douglass Company, Incorporated of any class shall be made by the Trustees except by the unanimous decision of those who are acting as Trustees at the time. In the event of such dispositions, the Trustees are hereby authorized to execute, acknowledge, and deliver such assignment, deeds or other instruments of transfer as may be necessary, and no purchaser shall be required to see to the application of the proceeds. * * * TWELVE: In the event any of the Trustees herein named fail to undertake and accept their duties as such Trustee, or after accepting their duties as such Trustee fail to complete same through the period of this trust, then such vacancy in the Trustees shall be filled by the unanimous vote of the remaining Trustees, and the person so appointed shall serve as if he or she were an original Trustee. The corpus of Ruth's section of the Foundation trust was comprised of her one-half interest in identified stocks received by her jointly with Marjorie from the trustees of Oscar's estate. The total fair market value of the securities constituting the trust corpus of Ruth's section was $2,002,741.98 as of November 4, 1962, the *272 date of Ruth's death. Included in these securities were 59,665 shares of the common stock of Smith-Douglass Company, Inc. (sometimes hereinafter referred to as "Smith-Douglass"), 2,599 shares of Smith-Douglass 5% cumulative preferred stock and 1,341 shares of its 5% convertible preferred stock. As of November 4, 1962 the fair market value of the Smith-Douglass Company common stock was $1,275,339.37 and the fair market value of the preferred stock was $394,000. The securities of the trust other than the Smith-Douglass stock had a fair market value of $333,402.61. The remaining bases of the Smith-Douglass common stock and preferred stock as of November 4, 1962, were, respectively, $313,484.87 and $209,018.23 and the remaining bases of the other securities held by the trust as of November 4, 1962, totaled $152,602.45. Smith-Douglass was engaged during the years pertinent hereto in the manufacture and sale of fertilizers and animal food supplements. It was one of the large companies in this field and had plants and sales organizations in a number of states. In connection with its business it operated phosphate mines in Florida. Smith-Douglass was founded by Oscar and was incorporated *273 in 1921. Its common stock was listed on the New York Stock Exchange and its preferred stock was traded in the over-the-counter market. As of July 31, 1962, the total number of shares of its common stock outstanding was 1,002,672. During the ten months of 1962 prior to November the total number of shares of this common stock traded on the New York Stock Exchange was 148,300. In addition to the Smith-Douglass stock held by Ruth's trust and the equal amount held by Marjorie's trust, Ruth owned individually at the time of her death 60,112 shares of common stock and 2,664 shares of convertible preferred stock. 129 Ruth executed her last will on January 13, 1961, which created certain testamentary trusts. While Roy and Marjorie were named as joint executor and executrix, her residuary estate, after the payment of legacies, was devised to "a disinterested Testamentary Trustee" for the benefit of Roy, Marjorie and "their legal daughter Ann Charles." The Testamentary Trustee was granted broad powers with regard to the disposition of any securities forming a part of the trust corpus. However, the will provided "that so long as [her] son-in-law, Roy R. Charles, is living, any Trustee *274 of a Trust created by this will which contains any shares of Smith-Douglass Company, Incorporated, as a part of the corpus of that Trust shall vote the same at any meeting of the shareholders of said corporation in accordance with the written directions" of Roy if any were given. The trustees of Ruth's trust used a New York stock brokerage firm as their investment counsel. Its recommendations to the trustees have been few in number and have generally been followed. While no formal policy conclusion had been made by the trustees as of the date of Ruth's death with regard to whether capital gains should be realized for the purpose of obtaining funds to be distributed to charities, the amount of such distributions was and has always been less than the ordinary income of the trust. The trustees have had no thought of selling the Smith-Douglass common stock. Smith-Douglass was merged into The Borden Company in January 1965, the latter being the surviving entity. In connection with this merger the preferred stock of Smith-Douglass was redeemed in 1965 resulting in the realization by the trust of capital gain in the amount of $184,981.77. As of November 4, 1962, such a merger was completely *275 unanticipated. The following schedule shows the dividend income, interest income, capital gains, capital losses, and resulting total income less capital losses of the Ruth M. Smith Section of the Foundation trust for its fiscal years ending June 30, 1960, through June 30, 1967: Total Income
Fiscal Year
Dividend
Interest
Capital
Capital
Less
Ended
Income
Income
Gains
Losses
Capital
Losses
6/30/60
$109,758.83
$ 7.06
$ 60.39
$2,748.12
$107,078.16
6/30/61
105,258.30
470.73
105,729.03
6/30/62
103,925.91
589.52
19 .19
4,453.85
100,080.77
6/30/63
112,167.56
3,427.85
710.85
114,884.56
6/30/64
109,315.96
3,619.33
1,550.95
111,384.34
6/30/65
143,183.67
5,639.90
184,981.77 *
93.28
333,712.06
6/30/66
144,141.45
15,894.07
272.20
969.85
159,337.87
6/30/67
151,803.95
13,154.27
773.49
164,184.72
The following schedule shows for the Ruth M. Smith Section of the Foundation trust for the fiscal years ending June 30, 1960, through June 30, 1966, the dividend *276 income received from Smith-Douglass stocks and from the stock of The Borden Company after January 1965, the total income realized by the trust, and the percentage of dividend income from Smith-Douglass or Borden stocks to total income: Dividend Income From Smith-
Fiscal Year
Douglass (The Borden Company
Total
Ended
after January 1965) Stocks
Income
Percentage
6/30/60
$ 82,349.10
$ 109,826.28
75%
6/30/61
87,140.00
105,729.03
82%
6/30/62
89,219.00
104,534.62
85%
6/30/63
96,223.00
115,595.41
83%
6/30/64
95,322.75
112,935.29
84%
6/30/65
127,105.65
148,823.57 *
85%
6/30/66
133,337.82
160,307.72
83%
The following schedule shows for each of its fiscal years ending June 30, 1960, through June 30, 1966, the Ruth M. Smith Section of the Foundation trust's charitable 130 deductions claimed, payments out of current income, amounts set aside from current income, payments out of prior year's income, cumulative end of year balance, cash on deposit at end of year, and *277 end of year investment in U.S. Treasury notes and bonds and other bonds: 131 Amounts
Payments
Set Aside
Payments
Fiscal
Charitable
out of
From
out of Prior
Year
Deductions
Current
Current
Year's
Ended
Claimed
Income
Income
Income
6/30/60
$108,685.76
$ 22,445.56
$ 86,240.26
0
6/30/61
101,579.15
13,359.74
88,219.41
$ 86,240.26
6/30/62
101,106.35
-0-
101,106.35
48,600.00
6/30/63
112,089.76
-0-
112,089.76
95,175.00
6/30/64
109,431.83
0
10 9,431.83
102,625.00
6/30/65
328,187.54
-0-
328,187.54
83,375.00
6/30/66
153,515.15
153,515.15
-0-
281,646.00
End of Year
Cumulative
Cash on
Investment in
Fiscal
End of
Deposit at
U.S. Treasury
Year
Year
End of
Notes and
Bonds
Ended
Balance
Year
and other
bonds
6/30/60
$ 86,240.26
$ 86,240.26
$ 10,067.50
6/30/61
88,219.41
88,219.41
10,067.50
6/30/62
140,725.76
140,725.7 6
10,067.50
6/30/63
157,640.52
157,640.54
10,067.50
6/30/64
164,447.35
164,447.35
19,079.37
6/30/65
409,259.89
223,893.70
217,308.35
6/30/66
281,129.04
95,949.72
214,915.68 132 The fair market value of the *278 reversionary interest in the trust established by Ruth on July 1, 1959 was not less than $1,400,000.00 on the date of her death. Opinion KERN, Judge: The issue presented for our decision herein concerns the correct valuation to be placed upon "the reversionary interest of the Ruth M. Smith Section of the Oscar F. Smith Memorial Foundation, which is includible in [decedent's] gross estate." The valuation placed upon this reversionary interest in the estate tax return was $481,271.48. This was corrected by respondent in his determination of deficiency to $1,587,912.03. Both parties are agreed with regard to the total fair market value of the securities held by the trust constituting the Ruth M. Smith Section of the Oscar F. Smith Foundation described in our findings and are also agreed with regard to the terms of the trust. In spite of these areas of agreement, the parties differ with regard to their valuations of the reversionary interest here involved to the extent of over $1,000,000. The valuation method used by respondent was as follows: From the undisputed fair market value of the securities held by the trust ($2,002,741.98), he subtracted $414,829.95 representing the "value *279 of income interest for term certain of 6 years 9 months" determined by the use of a "factor from Table II Section 20.2031-7 of Estate Tax Regulations" (.207131), and the difference of $1,587,912.03 was determined by him to be the value of decedent's reversionary interest. The valuation of this reversionary interest set out in decedent's estate tax return differed from respondent's method in two important respects. Instead of using as the initial figure in the computation the fair market value of the trust assets ($2,002,741.98), the initial figure used was the "Total Remaining Basis of the Assets Originally Transferred to the Foundation which Mrs. Ruth M. Smith, or Her Heirs or Assignees, Can Lay Claim, Under the Terms of the Trust Indenture" ($675,105.55). After subtracting from this latter figure the amount of $68,105.55 representing "Estimated Losses in the Corpus of the Trust * * * on Account of Capital Losses Chargeable to the Principal Account" calculated at 10 1/8% of $675,105.55 for the period of 6 years and 9 months ($68,354.44 "evened out at $68,105.55"), the same factor from Table II, Section 20.2031-7 of the Estate Tax Regulations was applied to the remainder of $607,000.00 *280 ($675,105.55 - $68,105.55) and the resulting figure of $481,271.48 is the valuation appearing in the return. In an amended petition, petitioner alleged that "* * * petitioner believes that such fair market value to be less than the amount of $481,271.48 as reported on the federal estate tax return." On brief petitioner urges that the correct valuation figure to be used is $368,060.00, the average of the figures representing the conclusions of petitioner's two expert witnesses who testified as to the fair market value of decedent's reversionary interest in the trust. Respondent, on brief, contends that the correct valuation figure to be used is $1,554,571.77, representing the original figure used by him in his notice of deficiency ($1,587,912.03) minus the sum of $33,340.26, representing 10 percent of the fair market value of the trust securities other than the Smith-Douglass stock which respondent now concedes should be an additional discount factor "to take into consideration possible capital gains that might be realized and paid out during the remainder of the term of the trust and whatever capital losses might be absorbed by the trust corpus." Both parties are in agreement that *281 decedent at her death owned a reversionary interest in the property of a trust created by her and that the value of that interest was properly included in the assets of her estate which were subject to the federal estate tax. As we have indicated above, the parties disagree as to its value and the proper method of arriving at that value. Both parties are also in agreement in stating the problem of valuation here as being one of ascertaining the fair market value of the reversionary interest. While we accept this statement of the issue, we stress at the outset of our discussion that the record before us fails to show the existence of any market in which remainder or reversionary interests such as the one here to be valued are regularly bought and sold and fails to show any actual sales of such interests which may be properly used as comparisons. Therefore not only is the "market" a hypothetical market, but the willing seller with full knowledge of the pertinent facts under no compulsion to sell and the willing buyer with like knowledge of the facts and similarly under no compulsion to buy are also hypothetical. See United States v. Simmons 346 133 F. 2d 213, 217 (C.A. 5). Accordingly *282 the fair market value to be determined in this case is a hypothetical fair market value which is equivalent to "intrinsic or actual value." See Security-First National Bank of Los Angeles, Executor, Et Al., 35 B.T.A. 815, 824. Obviously the absence of an actual market in which interests such as the one before us are regularly bought and sold and the inavailability of comparable sales prices pose difficulties to the solution of our valuation problem. We have had occasion in the past to comment on other difficulties frequently met in the valuation of life and remainder interests in trust estates and the many uncertainties to which these interests are subject. "For example," we said in Hugh McK. Jones, 29 T.C. 200, 211, "no one can determine as of the date of a particular transfer in trust, how long the life beneficiary will live; or whether the trust estate will appreciate, depreciate, or be lost entirely; or what income, if any, the trust estate may yield during each year of the primary beneficiary's life. But yet in most cases, some value must be determined for the life estate or for the remainder * * *." In one respect the valuation problem presented *283 in the instant case is less difficult than those we had in mind when saying what we did in the Jones case, in that the reversionary interest to be valued follows a term for years rather than a life estate. However the problem has another feature making its solution more difficult, which is that the trustees in addition to having the not unusual power to sell trust assets, are directed to treat any resulting recognized capital gains as income to be distributed for trust purposes. We also point out that in this case we are not considering the rights of a remainderman having no identity with the settlor of the trust. To the contrary we are construing the reversionary interest created by the reversioner herself as settlor of the trust. Cf. Utley v. United States, 290 F. 2d 188, 190 (C.A. 9). Paraphrasing the language of that case, the question here is not whether a remainder interest bequeathed to a charity has sufficient certainty to qualify as a charitable deduction available to a testator's estate but is simply one of valuation, i.e. the determination of the market value of the reversion at the time of the death of the owner of the reversionary interest "considering *284 the uncertainties and probabilities," bearing in mind that no tax advantage should result from a state of uncertainty which has been deliberately created by the reversioner herself. We also stress that in the Utley case the court used the language "uncertainties and probabilities" rather than "uncertainties and possibilities." This language supports our inclination to approach the valuation problem before us "not as a theoretical problem of possibility but a practical problem of probability," see William H. Robertson, 26 T.C. 246, 251. See, also, Estate of Sallie Houston Henry, 4 T.C. 423, where (at p. 445) we said that a "willing buyer" of an equitable reversionary interest would measure the value of that interest as of the time of the reversioner's death "* * * by the probability that the corpus would be returned to her * * *." Petitioner in effect contends that since the trustees had the power to sell all of the assets of the trust during the ten year life of the trust (subject to some limitations with regard to the Smith-Douglass stock) and since the trust contemplated the distribution of the capital gains which might result from such sales, the figure *285 to be used in a valuation formula on which a discount is to be calculated and from which a discount is to be taken under section 20.2031-7 of the Estate Tax Regulations should be $675,105.55, the "Total Remaining Basis of the Assets" transferred by decedent to the trust which, it is alleged, represents the value of all she could lay claim to upon the termination of the trust. This is also the position of petitioner's expert witnesses who use this figure not only in connection with the discount above referred to but also in connection with other discounts evolved by those witnesses. The argument is that since the trustees could sell all of the trust assets during the ten years life of the trust and were to distribute any capital gains realized, the only assets to which decedent might make a claim at the termination of the trust enforceable by a court of equity in any and all events would be the money retained by the trustees in amounts representing the bases of the assets sold or the properties in which such money had been reinvested, and therefore the value of any reversionary interest could not be in excess of the basis of the trust assets. Petitioner relies on In Re Hill's Estate, 193 F. 2d 724 *286 (C.A. 2); and Maryland National Bank v. United States 236 F. Supp. 532 (D. Md.). In those two cases the facts of record affirmatively showed that the possibility of 134 the enjoyment by a reversioner of a reversionary interest even though it theoretically existed was so minuscule as to be of no value as of the date of the reversioner's death and therefore lacked the economic substance requiring its inclusion in the gross estate of the reversioner. [1] Petitioner points to rather vague language in the two cases indicating a view than an equitable reversion can exist with regard to only those assets of the trust which can be ordered returned to the reversioner in all events by a court of equity. Therefore petitioner uses these cases as authority for the argument that since the trustees might sell all of the assets of the trust during its ten years existence and, if such sales are made, they might result in capital gains which must be distributed, the only assets at the end of the trust to which the reversioner could lay claim in a court of equity might be funds representing the bases of the assets sold. The result of this argument appears to be that although petitioner *287 not only agrees but contends that we must determine the character and value of the reversionary interest as of the moment of the reversioner's death and only upon consideration of facts then in existence, we must calculate that value by starting with a figure representing what the value of those assets might be over six years later on the assumption that all of the assets of the trust as of the date of the reversioner's death had been sold by the trustees regardless of the probabilities of such sales as they appeared to reasonable persons on the valuation date. In our opinion neither the two cases cited by petitioner nor any other authorities of which we are aware sustain this argument. In our view the requirement, which both parties recognize, that the valuation of the reversionary interest be made as of the time of the reversioner's death and *288 in the light of facts and circumstances then in existence, carries with it the requirement that we consider the assets of the trust to be those then held by the trustee in a calculation of the reversion's value and, also, consider in such a calculation the question of whether there was at that time a probability that some or all of those assets would be sold at prices in excess of their basis by the trustees who would retain in the corpus of the trust only the bases of the assets sold, and, if so, the extent of such probability. If we determine that such a probability existed, and was significant, then a discount figure should be evolved calculated on the facts and circumstances in existence when the reversioner died (including the trust corpus as it existed on that date) which represents in dollars and cents our best estimate based on those facts as to the extent of that probability. The method of valuing the reversion used by the petitioner, which equates possibility with certainty, in effect calculates the discount figure as 100% of the excess of the fair market value of all of the trust assets over their bases which must first be applied to the fair market value of the trust *289 assets before other discount factors are applied in valuing the reversions. The method of valuation used by respondent reflects the use of a discount factor which reflects no probability that any of the Smith-Douglass stock, either common or preferred, would be sold by the trustees and only a small probability that any of the other securities held by the trustees would be sold at prices in excess of their bases during the remaining life of the trust, a probability represented by a discount factor of 10% of the fair market value of those other securities. While we agree with respondent that our calculations in connection with the valuation of the reversion here involved must begin with the fair market value of the trust assets as they were at the time of the reversioner's death, we disagree with his estimate of the extent of the probability that capital gains would "be realized and paid out during the remainder of the term of the trust" and that capital losses might be incurred and "absorbed by the trust corpus" which probability, he states, should be represented by the discount figure of 10% of the fair market value of the "other" securities. The use of this discount figure clearly *290 implies that respondent estimates no probability that capital gains will be realized (and paid out) as a result of the sale of any Smith-Douglass stock. Since we are of the opinion for reasons hereinafter set forth that there was a small probability that common stock of Smith-Douglass would be sold, and a slightly larger probability that preferred stock of Smith-Douglass would be sold and a greater probability than that represented by respondent's discount figure that the "other" securities held by the trust 135 would be sold, it is our view that respondent's one additional discount figure is inadequate. With regard to any probability as of the date of decedent's death that the trustees would sell the common stock of Smith-Douglass we agree with respondent that it was small but we are not inclined to consider it to be so insignificant as to justify no additional discount whatsoever. Smith-Douglass was founded by Oscar, decedent's husband and Majorie's father, and had been incorporated since 1921. The record clearly indicates that its success was the source of the family fortune and that petitioner and Marjorie were not only proud of Oscar's progress from a North Carolina farm *291 boy to a fertilizer tycoon and a leading citizen of Norfolk, but also had an interest in the policies guiding the management of Smith-Douglass - an interest quite natural in a mother and daughter who may well have held after the death of Oscar a controlling interest in the corporation. The record shows affirmatively that decedent individually owned over 60,000 shares of Smith-Douglass common stock at the time of her death and that she and Marjorie had owned almost 120,000 shares at the time of the creation by them of the two companion trusts in 1959. Although the legal titles of these shares (approximately 120,000) were transferred to the ten-year trusts, both decedent and her daughter named the trustees, prescribed the terms of the trusts and retained reversionary rights to the trust corpora. The record does not affirmatively show how many shares of this common stock were held individually by decedent's daughter or by the latter's husband. However, in view of the provisions of Oscar's will it would appear likely that the daughter owned individually as many shares as decedent. In any event the petitioner has not proved the contrary. Thus as of the time the trusts were established decedent *292 and her daughter owned at least 179,442 shares (and probably more) of the common stock of a publicly owned corporation listed on the New York Stock Exchange which has total outstanding common stock of a trifle over 1,000,000 shares. Such a block (almost a fifth of the shares outstanding) might well constitute the controlling interest of the publicly owned corporation, and petitioner has not proved the contrary. As a controlling interest such a block would have a greater value per share than those shares would have which might remain in the hands of decedent after a break-up of the block and the sale of two thirds of the shares which constitute it. See Perlman v. Feldman, 219 F. 2d 173 (C.A. 2). Thus, the sale of the Smith-Douglass common stock by the trustees would affect adversely the financial interest of the settlors and reversioners of the trusts. On at least one occasion Marjorie expressed her expectation to at least one trustee that the trustees "would vote-help vote the block of Smith-Douglass stock in [the] best interests [of Marjorie and decedent]." Testimony of several of the trustees clearly indicates that at the dates pertinent to the valuation of the *293 reversionary interest here involved the trustees considered that a sale of the Smith-Douglass common stock would not be in the best interest of decedent and her daughter and had no intention of selling that stock. [2] The provisions of decedent's will requiring the testamentary trustee to vote all Smith-Douglass stock in accordance with the directions of her son-in-law indicate that decedent had a keen interest in the power of control afforded to her and her family by reason of the ownership of this stock. And, we consider it to be of no little significance that decedent as settlor of the trust caused the trust instrument to contain the provisions in Article Seven which specified that with regard to any sale of 20 percent or more of the Smith-Douglass stock the trustees could make a valid sale only by unanimous vote although sales of any other property could be made by majority vote. After a careful consideration of the facts and circumstances shown by the record to have existed at the time of decedent's death we have concluded that there was at that time only a very small probability that the trustees would make sales of the Smith-Douglass common stock which would result in either *294 capital losses or in capital gains constituting distributable trust income and that a discount factor of.05 applied to the fair market value of the Smith-Douglass common stock adequately reflects that probability. With regard to the Smith-Douglass preferred stock only that part of the foregoing 136 discussion is pertinent which refers to the provisions of Article Seven of the trust instrument, the sentimental interest of decedent in Smith-Douglass and the fact that the trustees considered it to be a good investment. In our opinion there was a probability at the time of decedent's death that a part of this stock would be sold by the trustees resulting *295 in either capital losses or capital gains to be distributed as income. This probability was not large but was greater than the probability that the common stock would be sold. It is our further opinion that the fair market value of the Smith-Douglass preferred stock should be discounted not only by the income factor of.207131 but also by the additional factor of.10 to take into consideration possible capital gains which might be realized from sales of each stock and be paid out or capital losses which might be sustained and absorbed by the trust corpus during the term of the trust remaining after the decedent's death. With regard to the securities of the trust other than the Smith-Douglass stock we think that the probability of their sale was considerably greater. In our opinion, the additional discount factor to be applied to their fair market value should be.25 instead of the factor of.10 urged by respondent on brief as a discount factor "to take into consideration possible gains that might be realized and paid out during the remainder of the term of the trust and whatever cpital losses might be absorbed by the trust corpus." We realize that these discount factors represent approximations *296 or estimates. We have made them after a careful consideration of the entire record but we readily admit our inability to prove their exact accuracy. As the Court said in Morris M. Messing, 48 T.C. 502 at p. 512, with regard to another valuation problem, we must not make "an overzealous effort * * * to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement." We do stress the fact that our estimates and conclusions result from a consideration of only those facts and circumstances existing at the time of decedent's death. While we have made findings as to facts subsequent to decedent's death, we have made such findings because of the rule laid down in Tex-Penn Oil Co. v. Commissioner, 83 F. 2d 518 (C.A. 3), aff'd. 300 U.S. 481, to the effect that "subsequent events are material in testing the propriety of a valuation." Accordingly, we have used such facts to test our valuation and not to make it. We have examined carefully the testimony of petitioner's expert witnesses and their valuation reports, which were received in evidence. In *297 our opinion the value which they have placed on the reversionary interest here involved has little if any relationship to the real value of that interest. They have assumed a limited market, a buyer only willing to buy at a price so low that all risks inherent in such an investment are eliminated and a seller willing to sell the interest, not at its "intrinsic or actual" value, but, at a price to be obtained from such a buyer on such a market. In our opinion their valuations reflect a price obtainable on forced sale rather than a price arrived at in a hypothetical transaction in which there was a hypothetical willing seller with full knowledge of the facts and under no compulsion to sell. See Security-First National Bank of Los Angeles, Executor, supra; William Korn, Et Al., Executors, 35 B.T.A. 1071. Following the rationale of those cases we accord little weight to their opinions. See also, H. H. Blumenthal, 21 B.T.A. 901. With regard to the specific points raised by them which in their opinion affect the value of the reversionary interest it is our judgment that to the extent that these are pertinent or significant they are adequately reflected *298 in the discount factors referred to above. The rounded figure arrived at by us in our ultimate finding with regard to the valuation of the reversionary interest here in question indicates our disinclination to have our conclusion give any illusion of mathematical precision even though, as we have indicated in this opinion, we have been aided in reaching this figure by the use of percentage factors. Decision will be entered under Rule 50. 137 Footnotes
*. Capital gain realized from redemption of Smith-Douglass preferred stock as part of merger of Smith-Douglass into Borden.↩
*. Is exclusive of capital gain of $184,981.77 realized from redemption of Smigh-Douglass 5% cumulative preferred stock incident to merger into The Borden Company.↩
1. The same observation may be made with regard to Utley v. United States, supra↩, in which the facts affirmatively showed no significant possibility or probability that a remainder interest would be enjoyed by the remainderman.
2. The testimony of one of the trustees on deposition with regard to this was as follows: Q. Apart from what they [the stockbrokers] might recommend the trust didn't have any plan to sell any significant portion of the corpus? A. No, sir. Most of the stock was [sic] held was the Smith-Douglass stock. Q. Speaking of Smith-Douglass stock, I gather that you in your place as trustee considered that to be a good investment? A. Good; yes, sir. Q. And you have had no thought all along of disposing of that? A. No, sir.↩